UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| PHILIPPI-HAGENBUCH, INC., and LEROY HAGENBUCH, <br><br>   Plaintiffs, <br><br> v. <br><br> WESTERN TECHNOLOGY SERVICES INTERNATIONAL, INC., and WOTCO, INC., <br><br>   Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 12-1099

# **O R D E R**

This case was before the Court on April 1, 2015, for a Daubert Hearing on two pending Daubert motions, as well as two other motions concerning expert testimony. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of this case.

The Court's role in determining the admissibility of expert testimony is that of a gatekeeper. *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517 (1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In performing this role, the Court must determine whether the expert testimony in question meets two essential requirements: (1) it must be based on scientific, technical, or other specialized knowledge and (2) it must assist the

trier of fact in understanding the evidence or determining a fact in issue. *Daubert*, 509 U.S. at 592; Fed. R. Evid. 702. In other words, the opinion must be reliable and relevant. *Daubert*, 509 U.S. at 597.

*Daubert* provides a list of four factors to be considered in determining the soundness of the expert's methodology:

> (1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence.

*Cummins v. Lyle Industries*, 93 F.3d 362, 368 (7th Cir. 1996), *citing Daubert*, 509 U.S. at 594-95. However, these factors are non-exclusive and do not constitute a definitive checklist. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The key concern is that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*, at 152. Ultimately, the trial judge is vested with considerable discretion in deciding whether particular expert testimony is reliable. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004).

**1.  Defendants' Motion to Exclude Certain Opinions of Plaintiffs' Technical Expert Frederick Smith [210]**

Defendants do not challenge Smith's qualifications as a technical expert. Rather, they argue that his opinions should be excluded primarily because there is no evidence to support them. The particular opinions challenged are:

- There are no acceptable, non-infringing alternatives to designing a truck body using the Load Profiling Patents.
- Truck bodies designed using the Load Profiling Patents are better than other truck bodies.

- Westech is using multiple angles of repose in its payload models (e.g., that a single angle on a form represents multiple angles that were measured from the front, rear, and sides of actual payload, but all happen to be identical.)
- Smith's interpretation of claim terms attempts to contradict or rewrite the actual language of the claims.
- Defendants copied the alleged inventions of the Load Profiling and Water Tank Patents.
- Smith cannot give opinions on non-technical advertising issues.
- Smith cannot give opinions concerning legal and evidentiary issues.

The first two opinions are implicated in Smith's testimony offered to establish the basis for Plaintiffs' claim for lost-profit damages. The parties agree that establishing lost-profit damages must satisfy the *Panduit* factors as discussed in *Rite Hite Corp. v. Kelley Co, Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995).

> To recover lost profits damages, the patentee must show a reasonable probability that, "but for" the infringement, it would have made the sales that were made by the infringer. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F. 1152 (6th Cir. 1978), articulated a four-factor test that has since been accepted as a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damages. The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made. A showing under *Panduit* permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's prima facie case with respect to "but for" causation. A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. The patentee need only show that there was a reasonable probability that the sales would have been made "but for" the infringement. When the patentee establishes the reasonableness of this inference, e.g., by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales. The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales.

Smith's testimony with respect to acceptable alternatives and the superiority of the patented inventions are an attempt to satisfy the first two factors under *Panduit*.

Defendants argue that Plaintiffs cannot make this showing because even if Westech was removed from the market, there are 13 other competitors making these truck bodies, and there are no allegations that these other competitors are infringing Plaintiffs' patents or that customers find their truck bodies unacceptable; in fact, Tate (Plaintiffs' damages expert) summarizes sales from four of these competitors who sold 371 truck bodies as compared to Plaintiffs' nine sales during the same period. These other competitors are much larger producers of truck bodies than Plaintiffs, and it is the end user/purchaser who determines what is acceptable, not Smith assessing the situation from a technical perspective where he has not done the studies necessary to support his opinion. While Defendants have identified several inconsistencies or weaknesses in Smith's testimony, these inconsistencies go to weight rather than admissibility and can be addressed through rigorous cross-examination.

Defendants also challenge Smith's opinion that Westech is collecting multiple angles of repose (all of which happen to be the same), as opposed to a single angle, in designing its payload models. The truck body profile form completed by the customer asks only for a single angle of repose, and even Plaintiffs' own research shows that front, side, and rear angles of repose are invariably different in the field. It is clear that the patent requires multiple angles of repose – that is part of the way this was distinguished from prior art in the field. As Smith clearly indicates that multiple angles of repose are required, which is consistent with the patent claims, his opinion that building truck bodies based on the single angle requested on Defendants' forms infringes on the patent because all of these angles happen to be identical is not excludable if there is evidentiary support for this opinion.

Defendants ask the Court to bar Smith from giving opinions about the application of certain terms in the claims that would amount to re-writing the claim language to cover

4

something completely different. Specifically, Defendants challenge: (1) Smith's explanation of the "adjusting step" as contradictory to the claim itself in the Load Profiling patents; (2) Smith's definition of "door" as either a doorway or door closure in the Water Tank patents; and (3) Smith's opinion that the Water Tank Maintenance claims require multiple hatches that promote cross ventilation. The Court previously found that these claim terms are to be given their plain and ordinary meaning. During the *Daubert* hearing, the Court accepted Smith's definition of "door" and ruled that the patent required only the opening of a single hatch; other terminology will be defined in this Order.

Smith gives the opinion that Westech copied the inventions of the Load Profiling and Water Tank Patents based on Westech's possession of Hagenbuch's 2000 article from the SAE describing his invention, a 2011 article quoting Westech's CEO as saying that Westech reinvented itself in 2004, and a 2008 article entitled "Westech Tailors Its Truck Bodies to Meet the Fleet." However slim it may be, this is some evidentiary support for Smith's opinion. Although subject to substantial cross-examination, the objection goes to weight rather than admissibility, and the opinion will not be barred.

Defendants contend that Smith's opinions regarding advertising issues should not be allowed, as Smith is a technical expert with no expertise in advertising, and that he is not allowed to give opinion on legal and evidentiary issues. Westech concedes that Smith is qualified to opine on whether a particular advertisement is technically accurate by comparing the advertisement to federal regulations within his knowledge. Plaintiffs indicate that Smith is a technical expert, not an advertising expert, and that his opinion is being offered on false advertising issues solely to assist the jury in understanding the technical accuracy or inaccuracy

reflected in the advertising. Plaintiffs also confirmed that Smith is not a legal expert and will not be offering legal opinions in this case.

Accordingly, for these reasons, as well as those stated during the April 1, 2015, hearing, Defendants' Motion to Exclude Certain Opinions of Plaintiffs' Technical Expert Frederick Smith is denied.

**2. Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Damages Expert Michael E. Tate [200]**

Tate is offered as a damages expert. His qualifications to testify as an expert are not challenged. Plaintiffs seek both lost profits and reasonable royalty damages on the Load Profiling patents and only reasonable royalty damages on the Water Tank patents.

Defendants argue that Tate's loft profits opinion must be excluded because in applying the *Panduit* factors, Tate relies on the challenged opinions of Smith (that there is demand for the patented truck bodies and that there are no acceptable, non-infringing options), and that without Smith's opinions, Tate's opinions have no basis. Plaintiffs respond that there is nothing wrong with Smith's opinions and that Tate can reasonably rely on the opinion of another expert in that expert's area of expertise. Defendants also claim that Tate conflates demand for custom truck bodies with demand for truck bodies designed using Plaintiffs patented process in rendering his damages opinion. Plaintiffs point to testimony from the head of Defendants' sales department that customers purchase the custom truck bodies over generic bodies because they are designed to meet the customer's specifications, carry a particular load, and "max out" the trucks performance; these benefits make the additional cost worthwhile to the customer. Having denied

the request to exclude Smith's opinions, the Court finds that the remaining challenges to Tate's opinions go to weight rather than admissibility.

Tate's reasonable royalty opinions are challenged for failure to apportion reasonable royalty damages between the patented and non-patented features of the patents as required by *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014), and *Garretson v. Clark*, 111 U.S. 120, 121 (1884). The basis for this argument is the assertion that reasonable royalty damages cannot be calculated based on the market value of the entire product, but rather must be based on the smallest salable component that practices the invention; calculations based on the entire product market value are only appropriate where the patented feature creates the demand for the product. As Tate did no investigation or analysis on the demand for truck bodies designed using the patented process, Defendants maintain that he has no basis for using the entire product value in his calculations.

The Federal Circuit has established that royalty awards are based on "the smallest salable patent-practicing unit." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Plaintiffs maintain that their patented design process creates a truck body or water tank; there is no smaller, salable unit that can be separated or apportioned out for purposes of calculation. The patented inventions (even as licensed by Plaintiffs) are the entire water tank and the process for creating an entire truck body, whereas the relief sought by Defendants applies only where the patented invention/process is part of a larger, multi-component product that combines the patented invention/process along with other non-patented inventions/processes. Moreover, even if Plaintiffs were required to show that the patented features create a demand for the entire product, they argue that the emphasis on the benefits of the patented features in Westech's own advertising would make such a showing.

7

For the reasons set forth in this Order, as well as those stated during the April 1, 2015 hearing, Defendants' challeges to Tate's reasonable royalty opinions also go to weight rather than admissibility. The Motion to Exclude Opinions and Testimony of Plaintiffs' Damages Expert Michael E. Tate is denied.

### III. Plaintiff's Motion to Strike and Preclude Defendants from Rearguing Claim Construction [183]

Plaintiffs ask the Court to strike the claim construction arguments in the expert reports of Dr. Daniel D. Frey as incorrect and inconsistent with the Court's Order on Claim Construction. They argue that expert testimony on claim construction is irrelevant and that experts should not be allowed to construe terms that are to be given their plain meanings, citing *Cook Inc. v. Endologix, Inc.*, 2012 WL 3886204, at *4 (S.D.Ind. Sept. 6, 2012), for the proposition that where the Court concludes that a term requires no construction, "it does not invite the parties to present their arguments about that term's meaning to the jury."

Defendants respond that the Court did not construe the terms at the Markman hearing. This is incorrect, as the Court did construe the terms by determining that no further construction was necessary and directing that they be given their ordinary and customary meaning. Not surprisingly, the parties now disagree over the scope of the ordinary and customary meaning of these terms. Dr. Frye conducted his own independent investigation into the plain and ordinary meaning of the claim terms at issue. Defendants urge the Court to review Dr. Frey's analysis, as well as the evidence he relied on, and decide for itself whether his opinions are correct. They cite *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008), for the

proposition that where the ordinary meaning of a term does not resolve the parties' dispute, the Court must determine what claim scope is appropriate in the context of the patents-in-suit.

The Court previously issued a preliminary determination that certain identified terms in the patents should be given their ordinary and customary meaning, namely the meaning a person of ordinary skill in the art in question would attach to the term. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). However, following discovery, the parties now dispute the scope of these terms and what the ordinary and customary meanings are in the context of the patents at issue. As the direction to use the terms' ordinary meanings did not resolve the parties' dispute, the Court finds that it has an obligation to resolve the dispute. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). If intrinsic evidence (the patent itself, including its claims, specification, and complete prosecution history) does not resolve the dispute, extrinsic evidence, including credibility determinations among factual interpretations by expert witnesses, may be considered to resolve the factual dispute. The terms in dispute are as follows:

**Terms Related to the Water Tank Patents**

The first term in dispute is **"pivotal baffle."** While there is no dispute that the term baffle means "an interior wall in a water tank," adding the word "pivotal" to the term has created much disagreement. Plaintiffs take the position that the ordinary and customary meaning of this term is "A portion of a baffle that pivots, such as a door in a baffle." Defendants respond that the ordinary and customary meaning is "a baffle that pivots." In reviewing the figures (e.g., Fig 3) and claims 22-24, 36, and 60 of the '091 Patent, it is clear that the so-called pivotal baffles refer to the baffle doors that can pivot on the hinges attached to the walls to open or closed

positions and match up with the lateral, C-shaped ribs to form the lateral baffle system supporting the two side sections of the tank. The Court finds that the testimony of Plaintiff's Expert Smith is more credible on this point and adopts Plaintiff's scope of the ordinary and customary meaning of this term being **"a portion of a baffle that pivots, such as a door in a baffle."**

The next term is **"door."** Plaintiffs argue that a door in the context of these patents is "an opening and/or a closure for an opening." Defendants respond that a door is "a movable closure for an opening." The Detailed Description of the Invention for the '091 Patent (col. 5, line 59 - col. 6, line 40) describes doors as being on hinges so they can move between open and closed positions. The Independent Claim 1 of the '507 Patent refers to doors as openings sized to allow a person to walk between compartments. Dependent Claims 5 and 8 refer to doors as closures that can seal the opening or being hinged to the tank for pivoting between open and closed positions. Given the lack of reference to closing in Claim 1, the Court finds that the term door could refer to both an opening and a closure for the opening. The testimony of Plaintiff's Expert Smith is more credible in this respect, and the Court adopts Plaintiff's scope of the ordinary and customary meaning of this term being **"an opening and/or a closure for an opening."**

The final claim dispute with respect to the water tank patents involves **"unfastening and opening a hatch of one or more access openings."** The parties dispute whether the water tank patents require opening more than one hatch. Claim 35 of the '507 Patent references opening <u>the hatch</u> of <u>one or more access openings</u> on an exterior surface of the tank; there is also a reference to access openings being positioned on the exterior of the tank to promote circulation of air into the interior of the tank when <u>the hatch</u> is opened. There are two different concepts at play here, namely the positioning of access openings on the exterior of the tank and the number of hatches

to these access openings that must be opened.  Clearly, Claim 35 contemplates the existence of multiple access openings, yet it also plainly allows for the possibility that the hatch of only one of these access openings will be opened in performing tank maintenance.  While Claim 35 allows multiple hatches to be opened, nothing in the claim requires it.  Accordingly, the Court finds that the plain and ordinary meaning of this phrase encompasses **opening at least one hatch** to promote the circulation of air.  Any other construction would render the word "one" in Claim 35 meaningless.  Whether this would provide effective circulation of air is not for this Court to decide.

### Terms Related to the Truck Body Patents

The Truck Body Patents claim a process for designing a custom truck body for specific field operating environments by taking into consideration actual field conditions through the use of three-dimensional modeling of the loads to be hauled.  As these patents describe a process, many of the contested terms are inter-related, overlap, and build upon each other to culminate in the actual production of the custom truck body.  Accordingly, determinations of the meaning and scope of these terms must be considered in the context of the patented process itself.

As set forth in the patents, the process begins with gathering information in the field to determine the heaping characteristics of the material to be hauled.  At a minimum, this information must include angles of material repose in three dimensions, namely front, rear, and side angles.  This information is then used to develop a three-dimensional model of the load to be hauled in the truck body.  This three-dimensional load model is then compared to a predetermined load center of gravity for the chassis to arrive at a set of design parameters.  If the center of gravity of the three-dimensional model aligns closely with the predetermined location

on the chassis, the design is complete, and the body is produced in accordance with the design parameters. If the center of gravity for the three-dimensional model does not align closely with the predetermined location on the chassis, then the design parameters for the truck body must be adjusted until the center of gravity for the three-dimensional model is in alignment with the predetermined location on the chassis. Then, the body will be produced in accordance with the adjusted design parameters.

A central term in the truck body patents is "angles of repose." It is undisputed that the plain and ordinary meaning of **"angles of repose"** is plural. The process begins by determining the heaping characteristics of the actual load to be hauled by collecting data/information about the load. Plaintiffs assert that the ordinary and customary meaning of collecting angles/ information/data can encompass receiving a single angle of repose (actual or theoretical) from a customer, such as what is obtained on Defendants' information sheets, while Defendants insist that at a minimum, the scope of these terms requires obtaining photographs of a heap of material in a dump body at a mine site that can be used to measure the multiple angles of repose of the heaped load of material.

Claim 1 of the '357 Patent refers to determining heaping characteristics at the anticipated point of use including at least angles of material repose in three dimensions, wherein angles of material repose include front, rear and side angles. Claim 20 requires developing a three dimensional model, where the model incorporates angles of material repose in three dimensions for an actual load at an anticipated point of use. Claim 46 in the '357 Patent provides:

> (a) collecting data describing a three-dimensional shape of an
> actual heap of the material, where the shape is affected by the

particular characteristics of the material and the data includes angles of repose for the heaped material;

(b) determining a set of design parameters for the body from the collected data . . .

Claim 55 likewise requires collecting data describing angles of repose of heaped material in three dimensions, where the data is from a working environment and the material is a particular material whose characteristics affect the angles of repose.

Considered in the context of the claims, the Court finds that the scope of the term **"angles of repose"** must encompass **more than one angle in three (front, back, and sides) dimensions.** A fair reading of the claims in context also reveals that the scope of data/information to be collected in the **"collecting multiple angles of repose/collecting data/collecting information"** terms must include, **at a minimum, angles of repose in three dimensions**, which would then mean that the design parameters referenced in the **"determining a set of design parameters"** terms necessarily include **at least the angles of repose in three dimensions**, as well. While the scope of the patent claims has minimum requirements as set forth above, the claims do not specify an exhaustive list of the data/information that must be collected. Accordingly, Plaintiffs' position that the scope of these terms encompasses "any data from a customer that could be incorporated into a payload model" is feasible, so long as the data includes the angles of repose in three dimensions.

The next issue involves how this data/information is to be collected. Defendants assert that the terms require "at a minimum, obtaining photographs of a heap of material in a dump body at a mine site that can be used to measure the multiple angles of repose of the heaped load of material."

Claim 1 of the '978 Patent refers to developing a three dimensional volumetric model using data collected from an anticipated point of use.  Claim 35 of the '357 Patent requires collecting information describing a three dimensional shape of a heaped load at an anticipated point of use.  Claim 60 of the '357 patent adds that the three dimensional data should be obtained by observing either the particular material to be hauled or different material having substantially the same heaping characteristics.

These **"collecting data"** terms clearly contemplate **obtaining actual data regarding the material at the mine site or a substantially similar material, either of which would include a minimum of angles of repose in three dimensions.**  However, nothing in the claims requires the data/information to be derived from photographs or prohibits the data/information from being collected and provided by the customer.

The angles/data/information collected is then used to develop a **three-dimensional model** of the load to be carried by the truck body.  Plaintiffs advocate that the scope of this term encompasses a payload model that includes four corner voids.  Defendants counter that the scope refers to a payload model that incorporates at least the multiple angles of repose and two or more corner voids.

Claim 1 of the '978 Patent refers to "developing a three dimensional volumetric model of a load to be carried in the body on a chassis using data collected from an anticipated point of use." The Detailed Description of the Preferred Embodiment, Figures 8, 8A, 9, 10a, 10b, 12, 13, and Claims 1, 20, 35, 55, and 60 of the '357 Patent clearly reference using the heaping characteristics of the material in three dimensions by incorporating the angles of repose in three dimensions (front, back and sides) in order to determine a payload model.

Accordingly, the Court adopts **"a payload model that incorporates at least the angles of repose in three dimensions"** as the scope of the ordinary and customary meaning of the **"three-dimensional model"** terms.

The shape of the three-dimensional model is also in dispute. The patent claims contain various descriptions incorporating the term **"conical."** Plaintiffs claim that this term references a payload model that is a cone or modified cone. Defendants counter that the term requires a payload model that has multiple angles of repose that have been blended to transform a pyramid shape into a shape that appears more conical. The plain language of the claims themselves is instructive. Claim 3 of the '978 Patent references the three dimensional volumetric model of the load as **"substantially conical."** Claims 20, 40, and 61 of the '357 Patent refer to the **"conical shape"** or **"generally rounded-off conical shape"** of the three dimensional model of the actual load. By contrast, Claims 11, 12, 28, 34 and 50 of the '357 Patent require an incremental blending of the respective side angles of repose to the front angle of material repose and an incremental blending of the respective side angles of repose to the rear angle of material repose. The express references to this blending process in some claims and not others promotes the inference that the blending process is not required in the claims where it is not mentioned. Accordingly, Defendants attempt to graft the requirement of an incremental blending process onto Claims 20, 40, and 61 of the '357 Patent and Claim 3 of the '978 Patent is not credible. Accordingly, the Court adopts Plaintiffs' position on the scope of the **"conical"** terms being **"a payload model that is a cone or modified cone."**

This brings us to the so-called **"adjusting step."** The parties' dispute centers on whether the adjusting step requires calculating a desired location before adjusting the design of the truck body or merely identifying the desired location after the design is complete. Plaintiffs claim that

15

the "desired location" is adjusted until a desired weight distribution is achieved and the center of gravity of the payload model will be located in the "desired location." Defendants argue that the "desired location" on the chassis is determined and then the design of the truck body is adjusted until the center of gravity for the payload model lines up with that location.

In Claim 1 of the '978 Patent, the process is undeniably set forth in sequential order. Determining a desired location for the load center of gravity comes before the adjusting step, which refers back to the desired location. This implies that the location is determined first and then the design is adjusted. Although the claims in the '357 Patent are not quite this clearly phrased, the Detailed Description of the Preferred Embodiment makes clear that the there is a center of gravity location contemplated by the chassis design that exists prior to the completion of the 3-D model of the load. (Col. 8, lines 50-60). Col. 9, lines 5-20 describes the adjusting step that must occur if the center of gravity contemplated by the 3-D model of the load is not close enough to the desired location on the chassis, where the data is used to adjust the parameters of the dump body to reach the proximity required. As explained by the Detailed Descriptions and read in connection with the claims, the desired location (i.e., the center of gravity contemplated by the chassis design) must logically exist before the design is adjusted to relocate the center of gravity of the payload. Defendant Expert Frye's position is more credible on this point, and the Court finds that in the context of the Patents, **the "desired location" on the chassis is determined prior to the adjusting step that brings the center of gravity of the payload model into alignment with the "desired location."**

## IV. Defendants' Motion to Strike and Bar Plaintiffs' New Infringement Theories [146]

The schedule in this case required all infringement theories to be disclosed in Final Infringement Contentions on January 29, 2013, with discovery closing on July 31, 2014, and expert reports being served on September 8 and October 14, 2014. In his report, Plaintiff's technical expert, Fred Smith, allegedly disclosed four new theories of infringement that had not been previously disclosed. Defendants move to strike and bar Plaintiffs from pursuing these theories based on lack of timely notice, as Plaintiffs made no attempt to seek leave to amend their final non-infringement contentions as required under Local Patent Rule 3.4: "[E]ach party must provide a final statement of its contentions on relevant issues, which the party may thereafter amend only 'upon a showing of good cause and absence of unfair prejudice, made in timely fashion following discovery of the basis for the amendment.'"

The four infringement theories challenged as being "fundamentally new" are: (1) direct infringement of claims 35-38 (method of performing maintenance of water tank) of the '507 Patent under 35 USC § 271(a); (2) infringement of all claims of the patents-in-suit under the doctrine of equivalents; (3) infringement of claims 35-38 of the '507 Patent based on the assertion that the fill hole/stairway access opening of the accused water tanks constitutes a "hatch of one or more access openings" within the meaning of claim 35; and (4) willful infringement based on allegations that Westech copied Plaintiffs' inventions. Defendants ask the Court to strike these new theories pursuant to the Court's inherent authority to enforce the rules and deadlines of the case, as well as Fed.R.Civ.P. 37(c) for failure to timely disclose the theories. They cite *Pactiv Corp v. Multisorb Techs, Inc.*, 2013 WL 2384249, at *1, 3-4 (N.D.Ill. May 29, 2013), for the proposition that allowing an expert to go beyond the party's final invalidity

contentions "would render them useless and ignore the specificity requirements of the Local Patent Rule 2.3." *See also, Trading Technologies International, Inc. v. CQG, Inc.*, 2014 WL 4477932 (N.D.Ill. Sept. 10, 2014) (striking portions of expert report that did not conform with final infringement contentions.)

This Motion was only addressed to the extent that Plaintiffs confirmed that theories (2) and (4) are not presently being pursued, but were raised only in anticipation of arguments to be made in rebuttal at trial. The remainder of this Motion will be addressed, if necessary, upon conclusion of the parties' discussions regarding the possibility of resolving this case prior to trial.

CONCLUSION

For the reasons set forth above, as well as during the April 1, 2015, hearing, Defendants' Motion to Exclude Certain Opinions of Plaintiffs' Technical Expert Frederick Smith [210] is DENIED. Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Damages Expert Michael E. Tate [200] is DENIED, and Plaintiff's Motion to Strike and Preclude Defendants from Rearguing Claim Construction [183] is GRANTED IN PART and DENIED IN PART. Defendants' Motion to Strike and Bar Plaintiffs' New Infringement Theories [146] is RESERVED. The Court will contact counsel to schedule this matter for phone conference to report on the status of settlement efforts.

ENTERED this 8th day of April, 2015.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge